# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSHUA CHRISTOPHER DIAZ,<br><br>                       Petitioner,<br>  vs.<br><br>MIKE D. MCDONALD, Warden,<br><br>                       Respondent. | CASE NO. 11-CV-02925-H (JMA)<br><br>**ORDER DENYING PETITIONER'S PETITION FOR WRIT OF HABEAS CORPUS PURSUANT TO 28 U.S.C. § 2254 AND DENYING CERTIFICATE OF APPEALABILITY** |

On November 29, 2011, Joshua Christopher Diaz ("Petitioner"), a California state prisoner proceeding pro se and in forma pauperis, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his conviction. (Doc. No. 1 at 6-7.) On April 13, 2012, Mike D. McDonald ("Respondent") filed a response in opposition. (Doc. No. 17.) On August 20, 2012, the magistrate judge issued a report and recommendation to deny the petition. (Doc. No. 19.) No objection to the magistrate judge's report and recommendation has been filed to date. For the following reasons, the Court denies the petition for writ of habeas corpus.

/ / /

/ / /

/ / /

/ / /

# BACKGROUND

Petitioner argues that the prosecutor presented insufficient evidence to support the gang enhancements to his felony convictions. (Doc. No. 1 at 6.) Petitioner also argues that the court prejudicially erred by supplementing the standard jury instruction with additional language. (Doc. No. 1 at 7.) The following facts are taken from the California Court of Appeal decision in <u>People v. Ruiz et al.</u>, No. D053520, 2010 WL 3749195 (Cal. Ct. App. Sept 28, 2010). (Lodgment No. 5.) The facts are presumed to be correct pursuant to 28 U.S.C. § 2254(e)(1):

> In November 2006 Ruiz and his girlfriend, Ebony Miranda, lived in a house in Alpine, which was owned by Natasha Darby. Ruiz and Darby were cousins through marriage. Rachel Cohen also lived in the house. Cohen's sister, Angelica R., and Cohen's brother-in-law, Joseph Sanchez, stored their belongings at the house and occasionally stayed overnight at the house. Although they did not live there, Diaz and Jose Morales spent a lot of time at the house in Alpine. All of these individuals had two things in common: they smoked methamphetamine daily; and they supported their drug habit by stealing vehicles and selling the rims and stereos from the vehicles. Ruiz was the leader of "shot caller" of the vehicle-stealing operation. Cohen sometimes served as lookout when the men stole vehicles.
>
> Ruiz was a member of the Imperial Beach Dukes gang, and his moniker was "Big Drowzy." Diaz and Morales were members of the El Cajon Locos gang. Diaz's moniker was "Little Drowzy," and Morales's moniker was "Peewee."
>
> . . . .
>
> On the day after Thanksgiving, Cohen, Ruiz, Miranda and Darby were in the Alpine house. Ruiz summoned Cohen in an angry voice and asked: "What kind of sick person do you think I am?" Ruiz accused Cohen of telling Miranda that he had slept with Darby. When Cohen denied this, Ruiz pushed her head into the wall and then pulled her by the hair into his bedroom, where Miranda and Darby were sitting on the bed. Ruiz threw Cohen on the floor and punched her in the head a few times while threatening to kill her, her sister and her brother-in-law. Ruiz then told Darby to get some trash bags and tape the bags on the floor. After complying with this order, Darby rolled Cohen onto the taped bags. Ruiz threw Cohen some handcuffs and zip ties and told her to put them on, but she was unable to do so. Ruiz het her and directed Darby to put them on Cohen. Darby put the handcuffs on Cohen's ankles and the zip ties on her wrists.
>
> Next, Ruiz told Darby and Miranda to leave the room, and he turned up the radio. Ruiz punched Cohen and then showed her some bolt cutters and asked her if she wanted to lose a finger or toe. Cohen replied by crying and Ruiz hit her again. When Cohen said she [would] rather lose a toe, Ruiz started to squeeze the bolt cutters around her little toe, but was interrupted by a phone call and left the room. When he returned, Ruiz

blindfolded Cohen and moved her into the closet of Darby's room, where he left her for what seemed like hours. Cohen awoke when water was splashed on her face. She heard Ruiz, Darby and Miranda laughing and joking that she was dead. Ruiz hit Cohen and placed a chair over her so she could not move her arms. Ruiz also told Cohen, who was blindfolded, that Diaz and Morales were there. Cohen heard Ruiz tell Diaz and Morales she had informed Miranda that Ruiz and Darby had slept together. Ruiz then ordered Cohen: "Tell my two homies what kind of sick [f - - -] you think I am." Ruiz told Cohen he was going to teach her a lesson and turned up the radio. Ruiz, Diaz and Morales began hitting and kicking Cohen on all sides of her body. Although Cohen could not see because of the blindfold, she recognized the voices of Diaz and Morales.

On Sunday, Diaz picked up Angelica and Sanchez from a hotel in La Mesa and drove them to the Alpine house. When they arrived, Ruiz asked Angelica and Sanchez if they had been talking about him sleeping with Darby. Angelica said she did not know what Ruiz was talking about, which angered him. After Angelica asked where her sister was, Ruiz escorted her to his bedroom where Cohen was lying on the floor on top of plastic bags and underneath a chair. She was blindfolded with her wrists and ankles bound, and she was crying. Diaz removed Cohen's blindfold, helped her get up and walked her to the living room, where everyone was gathering. Ruiz then punched Sanchez, knocking him to [the] floor. Ruiz started kicking Sanchez. Angelica started screaming, and Miranda punched her in the mouth. Sanchez was dragged to one of the bedrooms, Angelica was thrown into a closet and ties to the clothes rod, and Cohen was taken back to Ruiz's bedroom, where she fell asleep.

When Cohen woke up, she was blindfolded and started shaking. Ruiz and Diaz told her to stop playing around. Three people started hitting and kicking her. They stopped when Cohen said she was going to throw up. Diaz and Morales took Cohen to the bathroom where she vomited. When they brought her back to the bedroom, Cohen passed out.

Meanwhile, after allowing Angelica to use the bathroom, Ruiz moved a mattress into the room and placed her on it. Ruiz told Angelica he would let her escape out the window and handed her his revolver. He asked her to shoot him with the gun. When Angelica tried to shoot him, Ruiz said, "Tricked you," and showed her the bullets were in his hand.

Shortly thereafter, Cohen and Angelica heard a shotgun blast. Morales had accidently shot himself, grazing his testicles. Ruiz told Diaz to take Morales to the hospital, and Miranda and Darby accompanied them. Ruiz stayed behind in the house and segregated Sanchez, Cohen and Angelica. Ruiz placed Angelica on the bed and lay down next to her. Angelica testified that Ruiz raped her at this point. After a few minutes, Ruiz told Angelica she had five minutes to get herself, Cohen and Sanchez out of the house before he killed them. Angelica managed to extricate Cohen and Sanchez and the three of them left the house. The trio stole a neighbor's car and drove to the residence of Sanchez's brother in Lemon Grove and later to a motel, paying for the room with money from a purse that was in the car they had stolen.

. . . .

     El Cajon Police Detective Royal Bates of the department's gang task force testified the El Cajon Locos gang's primary activities included assault with a deadly weapon, auto theft, murder, narcotics sales and vandalism. Diaz and Morales were members of the El Cajon Locos, and their monikers were "Drowzy" and "Pee Wee." Ruiz had been closely associated with the El Cajon Locos since the early 1990s, and most of his criminal activity was with members of this gang.

     Detective Michael Speyrer of the sheriff's department testified that Ruiz was a member of the Imperial Beach Dukes gang, and his monikers were "Drowzy," "Mr. D.," and "Big Drowzy." Speyrer said that if more than one gang member has the same moniker, the less senior typically will add a prefix such as "little" to his moniker. The primary activities of the Imperial Beach Dukes are vandalism, auto thefts, burglaries, robberies, assaults and homicides.

     Gang members commonly work as a crew in their money-making activities, Speyrer testified. Sometimes the crews include gang members from different gangs. Among other things, "mixed crews" are used in car thefts.

     Speyrer told the jury that respect within their gang is very important to gang members. Gang members gain respect by "putting in work" or committing crimes and earn more respect for committing serious crimes. Gang members are expected to back up fellow gang members, especially older ones, to maintain their status within the gang. Not doing so puts them at risk of being beaten up, ostracized and losing the trust and respect of the gang. Gangs practice a code of silence: If a gang member or an associate of a gang talks to law enforcement they typically will be labeled a "rat," which puts them at a great danger–even of being murdered, especially if that person is incarcerated.

     Speyrer opined that all of the charged crimes except the rape were gang-related crimes that benefit[t]ed the gang. According to Speyrer, the crew of car thieves was more than a group of drug addicts committing crimes to support their habits because it involved gang members working together at the direction of a more senior gang member and shot caller. The gang members are intentionally assisting each other in committing crimes. The gang benfits because the crimes enhance the status of the gang as well as each individual participating gang member. Speyrer also testified that a crime that might have started between a single gang member and a victim becomes gang related when other gang members later assist in the crime.

     The prosecution also introduced numerous letters written by Miranda, Diaz and Ruiz while they were in jail, which were replete with gang references.

     . . . .

Petitioner appealed the conviction to the California Court of Appeal on the grounds of insufficient evidence to support his conviction for torture and for the application of gang enhancements, prejudicial error in the trial court's instructions to the jury concerning the

elements of aiding and abetting, and error by the trial court in failing to stay his sentence. On September 28, 2010, the appellate court issued a decision affirming Petitioner's conviction. See Ruiz, 2010 WL 3749195, at *23. On January 19, 2011, the California Supreme Court denied the petition for review of the appellate court's decision. People v. Ruiz, No. S187890, 2011 Cal. LEXIS 556 (Cal. S. Ct. Jan. 19, 2011).

On November 29, 2011, Petitioner filed a habeas corpus petition in this Court. (Doc. No. 1.) Petitioner did not file a state petition for habeas corpus in California courts. (Doc. No. 1 at 3.) Petitioner alleges that he is entitled to relief because there was insufficient evidence to support the application of gang enhancements and that the trial court's instructions to the jury were erroneous as to the elements of aiding and abetting. (Doc. No. 1 at 6-7.)

## DISCUSSION

### I. Standard of Review

A petitioner in state custody pursuant to the judgment of a state court may challenge his detention only on the grounds that his custody is in violation of the United States Constitution or the laws of the United States. 28 U.S.C. § 2254(a). The Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended 28 U.S.C. § 2254(d)), applies to § 2254 habeas corpus petitions filed after 1996. See Lindh v. Murphy, 521 U.S. 320, 336 (1997). Pursuant to the AEDPA, when a petitioner does not challenge a state court's determination of the evidence, a § 2254 habeas corpus petition must not be granted with respect to any claim adjudicated on the merits by a state court, unless the adjudication resulted in a decision that "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court," or "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

To determine what constitutes "clearly established federal law" under 28 U.S.C § 2254(d)(1), courts look to Supreme Court holdings existing at the time of the state court decision. Lockyear v. Andrade, 538 U.S. 63, 71-72 (2003). A state court decision is contrary to clearly established federal law when the court applies a rule that contradicts the governing

law set forth in United States Supreme Court cases. Id. at 73 (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). A state court decision is also contrary to clearly established federal law when the court confronts a set of facts that are materially indistinguishable from a United States Supreme Court decision but reaches a result different from that Supreme Court decision. Id. A state court decision involves an unreasonable application of clearly established federal law when it "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case." Penry v. Johnson, 532 U.S. 782, 792 (2001) (quoting Williams, 529 U.S. at 407-08) (internal quotation marks omitted). To be an unreasonable application of federal law, the state court decision must be more than incorrect or erroneous; it must be objectively unreasonable. Lockyear, 538 U.S. at 75.

When there is no reasoned decision from the state's highest court, the Court "looks through" to the last reasoned state court decision. Y1st v. Nunnemaker, 501 U.S. 797, 801-06 (1991). When the state court does not supply reasoning for its decision, an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law. Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). This independent review is not de novo; the federal court defers to the state court's ultimate decision. Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The district court may accept, reject, or modify the findings and recommendations of the magistrate judge, in whole or in part. 28 U.S.C. § 636(b)(1)(C). If neither party objects to the findings and recommendations of the magistrate judge, the district court is not required to make a de novo determination. See id. ("A judge shall make a de novo determination of those portions of the [findings and recommendations of the magistrate judge] to which objection is made.").

**II.     There Was Sufficient Evidence to Support Gang Enhancements**

Petitioner argues that the prosecution failed to present sufficient evidence at trial to support gang enhancements as to counts one, two, and four. (Doc. No. 1 at 6.) Specifically, Petitioner argues that the testimony of the prosecution's two gang experts was insufficient to prove, beyond a reasonable doubt, that Petitioner's conduct was for the benefit of, at the

direction of, or in association with a criminal gang. Id. Petitioner argues that the violence was motivated by personal issues between Ruiz and Cohen and not gang-related. Id. Petitioner unsuccessfully raised this issue on direct appeal. (Doc. No. 1 at 2.) The California Court of Appeal concluded that the detectives' testimony was not the only gang evidence presented to the jury and found that there was sufficient evidence to support the jury's verdict. (Doc. No. 19 at 8-10.) (Lodgment No. 5 at 38-42.)

A habeas petitioner challenging a state criminal conviction based upon insufficiency of the evidence is entitled to relief "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). The critical inquiry is whether any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt when the evidence is viewed in the light most favorable to the prosecution. Id. at 318-19. If the record contains facts that support conflicting inferences, the reviewing court must presume that the trier of fact resolved any conflicts in favor of the prosecution and defer to that determination. Id. at 326. In evaluating a sufficiency of the evidence claim, the reviewing federal court must look to the applicable state law defining the substantive elements of the crime. Id. at 324 n.16.

The California gang enhancement statute allows for additional punishment to apply if the defendant's conviction was gang related. See Cal. Pen. Code § 186.22(b)(1). The enhancement is applicable when the defendant is convicted of a felony committed (1) "for the benefit of, at the direction of, or in association with any criminal street gang" and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." Id.

Expert testimony regarding the importance of status and respect within gang membership can be sufficient to support gang enhancements for convictions of known gang members. People v. Albillar, 51 Cal. 4th 47, 59-63 (2010). In Albillar, a gang specialist testified that status and respect are two of the most important elements of gang membership, and committing criminal acts with fellow gang members is beneficial to the status of both the individual and the gang. Id. The court held that the testimony, in light of the factual evidence

showing gang affiliation, was sufficient for a reasonable jury to find that the defendants committed a crime for the benefit of, or in association with, a criminal street gang. Id. at 62. The court further held that if there is sufficient evidence that the defendants intended to commit and did commit the crimes with known gang members, then the jury may fairly infer that the defendants had the specific intent to promote, further, or assist criminal conduct by those gang members, including the conduct charged. Id. at 68. In Emery v. Clark, similar testimony was found to support gang enhancements on a defendant's murder conviction arising out of a situation involving a fellow gang member and the victim. Emery v. Clark, 643 F.3d 1210, 1216 (9th Cir. 2011). The expert testified that the defendant needed to use lethal force against the victim because the victim had disrespected a fellow gang member and the use of lethal force would help the defendant maintain his status as a hard-core gang member within his gang and other gangs in the area. Id. at 1214. Other courts have found similar testimony and factual findings of known gang affiliation to be sufficient to support gang enhancements. See People v. Romero, 43 Cal. App. 4th 15, 20 (2006) (finding officer's testimony that defendant's drive-by shooting outside a liquor store in territory known to belong to a rival gang would serve to boost defendant's status as a gang member was sufficient to support gang enhancements).

Petitioner has failed to show that there was insufficient evidence to support gang enhancements on his conviction. The appellate court found that Petitioner was known as "Little Drowzy." Ruiz, 2010 WL 3749195, at *6. El Cajon Police Detective Royal Bates testified for the prosecution as to Petitioner's known gang affiliation with the El Cajon Locos street gang and his moniker as "Drowzy." Id. Sheriff's Department Detective Michael Speyrer testified for the prosecution as to Mr. Ruiz's affiliation with the Imperial Beach Dukes gang, his moniker as "Drowzy" and "Big Drowzy," and that if more than one gang member has the same moniker the junior member would add the prefix "little" to his moniker. Id. Detective Speyrer also testified as to the importance of respect within gang membership, explaining that gang members maintain and gain status within the gang by committing serious crimes with

other gang members, are expected to assist fellow gang members,[1] and raise the gang's status in the community by committing criminal acts with fellow members. Id. The expert testimony presented in Petitioner's case is almost identical to the testimony presented in Albillar, Romero, and Emery. In each case, the experts testified as to the importance of status and respect within gang membership. In none of the cases was there a dispute as to the defendants' ties to criminal street gangs. Petitioner contends that the crimes arose out of a personal issue between Mr. Ruiz and Ms. Cohen and were therefore not gang-related. However, like the defendant in Emery, Petitioner's actions were in retaliation for Ms. Cohen's perceived disrespect of Mr. Ruiz and important for Petitioner to perform in order to maintain his status and respect within the gang. Therefore, the prosecution presented sufficient evidence to support gang enhancements. Emery, 643 F.3d at 1214, 1216.

A reasonable jury could find on the evidence presented that Petitioner committed the crimes with the required intent under the gang enhancement statutes. The California Court of Appeal reasonably applied the Supreme Court standard for claims of insufficient evidence. Accordingly, Petitioner's insufficiency of the evidence claim fails.

**III.    No Prejudicial Error in Jury Instructions**

Petitioner argues that the trial court prejudicially erred by supplementing the standard jury instruction with language that misdirected the jury as to the elements of aiding and abetting torture. (Doc. No. 1 at 7.) The California Court of Appeal found that the instruction was proper when viewed in the context of all the instructions given. (Doc. No. 19 at 16.)

A habeas petitioner alleging a constitutional violation because of instructional error must show that the instruction was not merely erroneous, "but itself . . . so infected the entire trial that the resulting conviction violates due process." See Henderson v. Kibbe, 431 U.S. 145, 154 (1977) (quoting Cupp v. Naughten, 414 U.S. 141, 147 (1973)). An instruction that is allegedly erroneous solely under state law is insufficient for habeas review. Estelle v.

---

[1] Detective Speyrer testified that gang members are expected to assist fellow gang members, especially more senior members of the gang. Ruiz, 2010 WL 3749195, at *6.

McGuire, 502 U.S. 62, 71 (1991).  The reviewing district court must inquire as to "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution."  Id. at 72 (quoting Boyde v. California, 494 U.S. 370, 380 (1990)).  The contested instruction must be viewed alongside all instructions given and the entire record.  Id.

For the crime of torture, the prosecution must prove that a defendant (1) inflicted great bodily injury on someone else; (2) with the intent to cause cruel or extreme pain and suffering for revenge or any sadistic purpose.  Cal. Pen. Code § 206.  Any person aiding and abetting in the commission of a crime is guilty as a principal in the crime.  See Cal. Pen. Code § 31 ("All persons concerned in the commission of a crime . . . whether they directly commit the act constituting the offense, or aid and abet in its commission . . . are principals in any crime so committed.").  When the offense charged is a specific intent crime, such as torture, the prosecution must show that the defendant (1) acted with knowledge of the criminal purpose of the perpetrator and (2) gave aid or encouragement with the intent of facilitating the commission of the crime.  People v. McCoy, 25 Cal. 4th 1111, 1118 (2001).

Petitioner has failed to show that the supplemental jury instruction so infected the trial that the conviction violates due process.  The court first instructed the jury that a defendant may be found guilty of a crime by either directly committing the crime or aiding and abetting the perpetrator who did commit the crime.  Ruiz, 2010 WL 3749195, at *18; see CALCRIM No. 400.  Next, the court instructed the jury that to prove a defendant is guilty of a crime based on aiding and abetting, the prosecution must show (1) the perpetrator committed the crime; (2) the defendant knew that the perpetrator intended to commit the crime; (3) before or during the commission, the defendant intended to aid and abet the perpetrator in committing the crime; and (4) the defendant's words or actions did in fact aid and abet the perpetrator in committing the crime.  Ruiz, 2010 WL 3749195, at *18-19; see CALCRIM No. 401.  The jury was therefore instructed as to the proper elements required to convict a defendant of a crime for aiding and abetting the perpetrator.  After instructing the jury as to the required elements for the crime of torture, the court added language stating:

> "An aider or abettor of the crime of torture does not have to have personally inflicted great bodily injury upon the victim, so long as you find beyond a reasonable doubt that at least one principal in the commission of the crime did personally inflict great bodily injury and that, when inflicting the injury, said principal intended to cause cruel or extreme pain and suffering for the purpose of revenge or for any sadistic purpose . . . ."

(Doc. No. 19 at 13.) This instruction cannot be viewed alone, but must be viewed in context with all the other instructions and the record. Estelle, 502 U.S at 72. Before delivering the supplemental instruction, the court instructed the jury that a defendant may be found guilty by aiding and abetting the perpetrator of a crime, the elements required for a conviction based on aiding and abetting, and the elements required for the crime of torture. There was sufficient evidence to support Petitioner's conviction for torture based on aiding and abetting liability. The jury found Mr. Ruiz guilty of torture. Ruiz, 2010 WL 3749195, at *1. Petitioner was present when Mr. Ruiz informed Ms. Cohen that he was going to teach her a lesson for disrespecting him. Id. at *2. Petitioner actually did aid in Ms. Cohen's torture by blindfolding Ms. Cohen and following Mr. Ruiz's instructions to move her around the house. Id. at *2-3. Petitioner continued to assist Mr. Ruiz after learning that he intended to take revenge on Ms. Cohen, showing Petitioner's intention to aid or abet Mr. Ruiz in torturing Ms. Cohen. Id. at *2.

The state court's rejection of Petitioner's prejudicial error claim regarding the jury instructions was not contrary to, or an unreasonable application of, federal law. Because there was sufficient evidence to support the jury's verdict, Petitioner fails to show that there was a reasonable likelihood the jury applied the supplemental language in a way that violates the Constitution. Accordingly, Petitioner's claim of prejudicial error based on an erroneous jury instruction fails.

**IV.    Denial of Certificate of Appealability**

Under AEDPA, a state prisoner seeking to appeal a district court's denial of a habeas petition must obtain a certificate of appealability ("COA") from the district court judge or a circuit judge. 28 U.S.C. § 2253(c)(1)(A). A court may issue a COA only if the applicant has made "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

To satisfy this standard, the petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000). In the present case, the Court concludes that Petitioner has not made such a showing and therefore the Court denies Petitioner a COA.

## **CONCLUSION**

The California Court of Appeal did not rule contrary to, or unreasonably apply, clearly established federal law. Based on the foregoing, the Court denies with prejudice Petitioner's petition for writ of habeas corpus and denies a certificate of appealability.

**IT IS SO ORDERED**.

DATED: October 25, 2012

_____
MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT